# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

JONATHAN CLARK et al.,

    Plaintiffs - Appellants,

        v.

CITY OF SHAWNEE, KANSAS,

    Defendant - Appellee.

Case No. 17-3046

## APPELLEE'S RESPONSE IN OPPOSITION TO
## APPELLANTS' MOTION TO CERTIFY QUESTION OF STATE LAW

The City of Shawnee, Kansas ("the City") opposes Appellants' Motion to Certify Question of State Law to the Kansas Supreme Court and respectfully requests that this Court enter its Order denying that motion.

## I.    ISSUE

The Clarks claim that the Kansas Supreme Court needs to decide whether Kansas law preempted the City's ordinance. Kansas law expressly permits city regulation when a state statute exempts that subject matter from state field preemption. The Kansas statute the Clarks claim preempted the Ordinance expressly exempted the subject matter of the Ordinance from field preemption. Should the Kansas Supreme Court be forced to reiterate a clearly established law?

{O0334702}

## II.    ANALYSIS

The district court made clear that the Clarks' preemption argument was wholly baseless. "Jonathan has no viable authority for his argument."[1]

Kansas law permits the Kansas Supreme Court to answer questions of law certified to it by this court.[2] But it may only do so if the question "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state."[3]

Here, it cannot be reasonably said that Kansas law is unclear as to whether state law preempted Shawnee City Ordinance § 9.13.040 ("the Ordinance"). Indeed, the state law at issue specifically allows for the exact municipal action encompassed in the Ordinance. The state statute at issue is the 2013 version of KAN. STAT. ANN. § 12–16,124, which was titled, "Firearms and ammunition; regulation by city or county, limitations."

On December 2, 2013, KAN. STAT. ANN. § 12–16,124 read, in pertinent part:

"Nothing in this section shall . . . prohibit a city or county from adopting an ordinance, resolution or regulation requiring a firearm *transported in any air, land*

---

[1] Ex. A, ECF No. 140, p. 15.
[2] KAN. STAT. ANN. § 60–3201.
[3] *Id.*

2

*or water vehicle to be unloaded and encased in a container which completely*

*encloses the firearm . . . ."*

On that same day, the Ordinance read, in pertinent part:

"Criminal Possession of a Firearm is an unlawful act that is prohibited

within the City. Criminal Possession of a Firearm is . . . *Transporting a Firearm in*

*any air, land, or water vehicle, unless the Firearm is unloaded and encased in a*

*container which completely encloses the Firearm.*"

As the district court observed, when state statutes contain express

exceptions, a city may regulate within the subject area of those exceptions as long

as the city's ordinance does not conflict with the state law.[4] Not only did the

Ordinance not conflict with state law, it used, almost verbatim, the same language

allowed by the Kansas statute.

It cannot reasonably be said that Kansas law preempted the Ordinance when

the Kansas statute specifically allowed for the municipal action encompassed in the

Ordinance. As the district court observed, "[the Ordinance] does not authorize

something that the statute forbids and [the Ordinance] does not forbid something

that the statute authorizes."[5]

---

[4] Ex. A, ECF No. 140, p. 15 (citing *Johnson County Water Dist. No. 1 v. City Council of Kansas City*, 255 Kan. 183, 194, 871 P.2d 1256 (1994)).
[5] Ex. A, ECF No. 140, p. 16.

Additionally, the Clarks seek to certify questions that are unquestionably irrelevant to this case. The Clarks have brought up these hypotheticals throughout the litigation as a seeming safety net in case the actual facts of the case are insufficient. They seek certification on a question that is essentially asking, "What if Jonathan's guns were visible to others, such as in a gun rack or a door pocket?" While that calls into question how a gun in a door pocket of a moving vehicle would be visible to others on the road, that is ultimately a moot point. As is their final question: Would openly carrying a firearm still be open carry if you stepped behind a curtain to use a latrine. There is no factual basis in the record that supports these hypotheticals having any bearing on this case. The Clarks do not even suggest that either hypothetical finds support in the record.

As this Court has recognized, the Supreme Court has made clear that such hypotheticals are not properly before the court and should not be considered. "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *United States v. Platte*, 401 F.3d 1176, 1187 (10th Cir. 2005) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)).

{O0334702}

The Kansas Supreme Court may not be bothered to reiterate settled law. And the Clarks are not entitled to a decision from this court or the Kansas Supreme Court on how a hypothetical fact pattern would affect the case.

WHEREFORE, the City respectfully requests that this Court enter its Order denying Appellants' Motion to Certify Question of State Law to the Kansas Supreme Court and granting the City such further relief that this Court deems just and equitable.

Respectfully submitted,
FISHER, PATTERSON, SAYLER & SMITH, L.L.P.

/s/ Christopher B. Nelson
Michael K. Seck, #11393
Christopher B. Nelson, #25548
51 Corporate Woods, Suite 300
9393 West 110th Street
Overland Park, Kansas  66210
(913) 339-6757 / Fax: (913) 339-6187
mseck@fisherpatterson.com
cnelson@fisherpatterson.com
*Attorneys for Defendant City of Shawnee, KS*

{O0334702}

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that all required privacy redactions have been made.

I further certify that any required hard paper copies are exact copies of the ECF filed reply.

I further certify that the ECF submission was scanned for viruses with the most recent version of virus scanning program, Trend Micro Security Agent, version 13.373.00, last updated 5/1/2017, and the digital version of the reply in Portable Document Format is virus free.

/s/ Christopher B. Nelson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2017, the foregoing document was filed electronically with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail, postage prepaid, to the following:

Jonathan Clark                            Eric S. Clark
6800 Maurer Road                      1430 Dane Ave.
Shawnee, Kansas  66217            Williamsburg, KS  66095
jrjonclark@gmail.com                  eric@whitestonepublishing.org

*Pro se Plaintiffs*

/s/ Christopher B. Nelson

{O0334702}

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JONATHAN CLARK
and ERIC S. CLARK,

                        Plaintiffs,

        vs.                                 Case No. 15-4965-SAC

THE CITY OF SHAWNEE, KANSAS,

                        Defendant.


MEMORANDUM AND ORDER

        The case comes before the court on the following motions that
are ripe for decision:  the motion for partial summary judgment (Dk. 86) by
the plaintiffs Jonathan and Eric Clark; the defendant City of Shawnee's,
("City's"), motion for summary judgment (Dk. 108); the plaintiffs' motion for
review (Dk. 124); the plaintiffs' second motion for partial summary
judgment (Dk. 128); the City's motion to strike (Dk. 130); and the plaintiffs'
motion to review (Dk. 134). While docketed as a motion for review, the
plaintiffs' filing (Dk. 124) simply asks the court to substitute "primary" for
"second" on page four of their filed response (Dk. 120) to the defendant's
summary judgment motion. The defendant does not oppose this change. The
court summarily grants the plaintiffs' motion (Dk. 124) requesting this
change. The court also summarily denies the City's motion to strike (Dk.
130), because many of the arguments are similar to those substantively
rejected in the court's prior order of October 4, 2016, (Dk. 107), and

**Ex. A**

because a decision on the other arguments will not materially advance the disposition of the case. Finally, the court summarily denies the plaintiffs' last motion for review (Dk. 138), because it fails to make an arguable showing that the magistrate's order denying their motion to compel was erroneous or contrary to law. Thus, the court will decide the three pending summary judgment motions by narrowing its focus to the common dispositive issues.

**SUMMARY JUDGMENT STANDARDS**

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, ––– U.S. ––––, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014)(quoting Fed. R. Civ. P. 56(a)). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. *Id.* at 252.

The moving party has the initial burden of showing "the absence of a genuine issue of material fact," and, if carried, the non-moving party then "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [it] carries the burden of proof." *National American Ins. Co. v. American Re-Insurance Co.*, 358 F.3d 736, 739 (10th Cir. 2004) (internal quotation marks and citation omitted). At the summary judgment stage, the court is not to be weighing evidence, crediting

some over other, or determining the truth of disputed matters, but is only to be deciding if a genuine issue for trial exists. *Tolan*, 134 S. Ct. at 1866. The court performs this task with a view of the evidence that favors most the party opposing summary judgment. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**STATEMENT OF FACTS**

On December 2, 2013, within the limits of the City of Shawnee, Kansas, the defendant Jonathan Clark was driving his truck which was pulling a trailer loaded with wooden pallets. Nathan Karlin, a police officer with the City of Shawnee, was driving his patrol car when he saw Jonathan's truck and trailer ahead. As it began to pull over to the side of the road, Officer Karlin activated his emergency lights and stopped behind Jonathan's truck and trailer. Officer Karlin stopped because the trailer's load was not secured. Officer Karlin also believed the trailer was one that required a license plate, and he saw none.

Officer Karlin asked Jonathan to produce proof of insurance. When Jonathan opened the driver's-side door of his truck, Officer Karlin saw a handgun in the door well. The handgun was not encased, but holstered,

and it appeared to be loaded. At this point, Officer Karlin grabbed the handgun from the door well and ordered Jonathan who was in the cab to put his hands up. Thinking the situation was threatening, Officer Karlin ordered Jonathan to go to the front of the truck and to get on the ground. Jonathan complied, and Officer Karlin handcuffed him without incident and asked him if he had a concealed carry permit. Jonathan told the officer that he did not have a permit.

Jonathan was later placed in a second officer's vehicle while his truck was searched. Officer Karlin found in the truck cab another loaded handgun which also was not encased. Officer Karlin provided Jonathan with a notice to appear for three ordinance violations:   (1) unlawful use of a firearm;  (2) spilling loads on highway due to failure to secure load, and (3) no registration on the trailer. About 50 minutes after the initial stop, Officer Karlin released Jonathan at the scene, but Jonathan's firearms were seized by Officer Karlin. The court has previously summarized the procedural disposition of these violations in a prior order. (Dk. 16, pp. 10-11). In short, Jonathan was convicted in municipal court of the firearm and spilling violations. Before the district court, Jonathan was convicted of the spilling violation but the city dismissed the firearm violation.

Eric Clark was not a passenger in the truck, was not at the scene of the arrest, and was not with Jonathan immediately before, during or after the traffic stop, arrest and search. Eric has never been detained or charged

with violating the firearm ordinance in question. Eric does not have a conceal carry permit. Eric stated in his deposition that there was "about a dozen" times when he did not carry any firearm while in the City of Shawnee during the period between December 2, 2013, the date of Jonathan's traffic stop, and August 25, 2014, the repeal date of the firearm ordinance. (Dk. 109-3, p. 6). Eric also testified that "once or twice" during the same time period he "carried a loaded unencased firearm[] in the City of Shawnee." *Id.* at p. 5.

The firearm ordinance in question is the City of Shawnee's § 9.13.040 Criminal Possession of a Firearm ("Ordinance"), that was in force on December 2, 2013, and that made it an unlawful act prohibited within the City to criminally possess a firearm by "Transporting a Firearm in any air, land, or water vehicle, unless the Firearm is unloaded and encased in a container which completely encloses the Firearm." (Dk. 87-1, pp. 9-10). This Ordinance was repealed on August 25, 2014, as a result of a state law making all ordinances null and void which were adopted prior to July 1, 2014, and which governed the "transporting of firearms or ammunition." (Dk. 87-1, p. 21).

**STANDING OF ERIC CLARK**

This will be the court's third chance to consider this issue. The plaintiff Eric has been afforded a full opportunity to present the factual and legal merits to his somewhat unusual position. In effect, Eric is bringing "a pre-enforcement challenge to a city criminal ordinance that has since been

repealed." (Dk. 16, p. 6). The uncontested record fully establishes that he no longer faces any credible threat of prosecution under the ordinance. State law now forecloses the City from having an ordinance that governs the transportation of firearms. Consequently, the plaintiffs' second amended complaint seeks relief only in the form of compensatory damages and makes no claim for injunctive or declaratory relief. In the same vein, the plaintiffs' summary judgment filings reiterate that they "are not seeking to have any ordinance or regulation **declared** as unconstitutional, nor seeking injunctive or prospective relief." (Dk. 87, p. 29)(emphasis in original). Eric's standing, therefore, is determined solely by his claim of compensatory damages for injuries allegedly sustained because the ordinance was in effect from December 2, 2013, through August 24, 2014, even though it was never enforced against him. Count one of the second amended complaint does allege that the "plaintiff Uncle Eric . . . has suffered damages including emotional distress, mental anguish, and loss of enjoyment of life." (Dk. 45, ¶ 42).

In his summary judgement filings, Eric explains his injuries to result from the ordinance's impact on his decisions to act and on his related emotional experiences. He has testified that there were "about a dozen" times when the ordinance influenced or chilled his behavior so that he did not carry any firearm while in the City of Shawnee. (Dk. 111-3, p. 7). There also were one or two times when, notwithstanding the ordinance, he decided

to carry a loaded and non-encased firearm while in the City of Shawnee.
(Dk. 109-3, pp. 5-6). Eric expands his allegations of a chilling impact by
arguing that he even felt compelled to not carry a loaded firearm from his
house across his curtilage before climbing into his vehicle and driving away.
(Dk. 118-1, pp. 3-6).[1] As far as transporting a firearm in compliance with
the former ordinance, Eric opines that transporting an unloaded and encased
firearm would have been more detrimental to his safety than transporting no
weapon. *Id.* Eric attributes his injuries not only from not carrying a firearm
under the threat of being arrested but also from the "suffering of mental
anguish similar to those of being held against your will (or worse) which is
never a pleasant feeling and when it is backed by threat of arrest which
means potential death during the process, it exacerbates the mental anguish
all the more." *Id.* at p. 6. Eric's filings are replete with his conjecture over
fears, apprehensions, threats and injuries that this ordinance caused him
during this nine-month period.

Article III limits federal court jurisdiction to cases and
controversies in the understanding that "the traditional role of Anglo-
American courts, . . . is to redress or prevent actual or imminently
threatened injury to persons caused by private or official violation of law."

---

[1] As the City points out, Eric has failed to show that he lived in the City of
Shawnee during the relevant period, and he lists his current address as
being in Williamsburg, Kansas. The court agrees with the City that Eric's use
of "second home" to describe Jonathan Clark's residence in Shawnee is a
conclusion that lacks meaning and needs evidentiary support and
explanation, and none has been provided.

*Summers v. Earth Island Institute*, 555 U.S. 488, 492 (2009). This doctrine of standing demands that a federal court satisfy itself "that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Id.* at 493 (internal quotation marks, citations, and italics omitted). The burden rests with the plaintiff to show "standing for each type of relief sought." *Id.* (citation omitted). For retrospective relief like compensatory damages, standing is based on past injuries. *Dias v. City and County of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009); *PETA, Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1201-03 (10th Cir. 2002) (Standing for compensatory damages resulting from officers directly threatening the plaintiff protestors at the scene with arrest if they did not cease, and the protestors left). "A plaintiff seeking retrospective relief, on the other hand, satisfies the 'injury in fact' requirement if she suffered a past injury that is concrete and particularized." *Tandy v. Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S 200, 210-11 (1995)) (Standing for compensatory damages resulting from the actual past invasion of statutory rights in having been denied access to public transportation).

    Eric's burden entails "three showings:  that . . . [he] suffered an injury in fact which is concrete and particularized, and actual or imminent; second, that there is a causal connection between the injury and the challenged conduct; and third, that the injury is likely to be redressed by a

favorable decision." *Dias v. City and County of Denver*, 567 F.3d at 1176

(citation omitted); *see Susan B. Anthony List v. Driehaus*, ––– U.S. ––––,

134 S.Ct. 2334, 2341 (2014).  The plaintiff's injury, moreover, must be

"actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations

omitted). "Since they are not mere pleading requirements but rather an

indispensable part of the plaintiff's case, each element must be supported in

the same way as any other matter on which the plaintiff bears the burden of

proof, *i.e.*, with the manner and degree of evidence required at the

successive stages of the litigation." *Lujan*, 504 U.S. at 561 (citations

omitted). Thus, on a summary judgment motion, the plaintiff "must set forth

by affidavit or other evidence specific facts, . . ., which for purposes of the

summary judgment motion will be taken to be true." *Id*. As this court has

recently said, "'[f]ederal courts scrupulously guard the boundaries of their

jurisdiction; they are duty-bound not to permit a standing determination to

rest on speculation or conjecture.'" *Clark v. Lynch*, ---F. Supp. 3d---, 2016

WL 5466389 at *3 (D. Kan. Sep. 29, 2016) (quoting *New Mexico Off–

Highway Vehicle Alliance v. U.S. Forest Service*, 645 Fed. Appx. 795, 804

(10th Cir. 2016)). Standing is analyzed from the facts existing when the

complaint is filed. *Tandy v. Wichita*, 380 F.3d at 1284.

Based on the ordinance's repeal, the City contends that Eric

cannot show any existing credible threat of prosecution for purposes of pre-

enforcement challenge and cannot show an injury in fact. Indeed, the repeal of a challenged law generally moots a constitutional challenge and claim for declaratory or injunctive relief. *See, e.g., Markadonatos v. Village of Woodridge*, 760 F.3d 545, 546 (7th Cir. 2014); *Coalition for Abolition of Mar. v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000). The City summarily denies that Eric sustained an injury in fact because the ordinance was never enforced against him. Eric, however, claims that he actually experienced "a credible imminent threat" of arrest during the relevant period and that this restrained him from exercising his Second Amendment right. (Dk. 87, p. 28). Eric's written arguments work at blurring the legal concepts involved:

> While "credible imminent threat" is often tied to **future** (prospective) relief claims, in the present case it is tied to a **past** injury because without physical restraint, a credible imminent threat had to exist at the time of the injury. That credible imminent threat was a threat of physical restraint initiated because of exercising a fundamental right and is supported by contemporaneous physical restraint of Plaintiff Jonathan Clark. In other words, "credible imminent threat" does not represent a future possibility but a past actuality. Mention of prior restraint as it applies to past injuries can undoubtedly be less than clear, but "past actuality" is the intended meaning for plaintiff's statements, such as, "erecting a threat of arrest [i.e., prior restraint] for both Plaintiffs" (See Doc. #1 at ¶ 36) and; such mentions should be interpreted as retrospective claims only, that is, as acting as a prior restraint at specific time(s) in the **past** (i.e. between Dec. 2, 2013 and August 24, 2014). A prior restraint is analogous in many ways to a seizure under the Fourth Amendment in that it occurs when government actors have, "by means of physical force **or show of authority**, . . . in some way restrained the liberty of a citizen," . . . except excluding the means of physical force and the liberty not necessarily being freedom of movement but freedom to exercise any fundamental right.

(Dk. 87, pp. 28-29). In sum, the court understands Eric to base his standing on having experienced what he alleges to be a credible imminent threat created by a combination of circumstances. First, the City had the authority to enforce this Ordinance against anyone traveling within its City limits. Second, Eric occasionally traveled in the City of Shawnee. Finally, upon learning of the firearm charges against his nephew, Eric felt restrained from exercising his Second Amendment rights to carry a loaded and non-encased firearm in his vehicle. Despite multiple pending dispositive motions, the City has avoided addressing this specific standing argument by Eric. Nevertheless, because standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant invocation of federal-court jurisdiction," *Summers*, 555 U.S. at 492–93, the court will address this issue.

Other than learning about the ordinance from his nephew's charges, Eric grounds his standing and seeks damages on having experienced the same general enforcement threat that faced anyone in the City of Shawnee transporting a firearm in a vehicle. Besides not coming forward with any legal authority that recognizes standing/damages on the basis of this general threat alone, Eric does not have the facts to support a sufficient imminent threat here. On the injury-in-fact requirement in a pre-enforcement setting, the Supreme Court has said there must be,

11

"circumstances that render the threatened enforcement sufficiently imminent," and the plaintiff must demonstrate, (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute," and (2) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 134 S.Ct. at 2342 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A credible threat of prosecution cannot rest on fears that are "'imaginary or speculative.'" *United Farm Workers*, 442 U.S. at 298 (internal quotation marks and citation omitted). On the other hand, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" a law on constitutional grounds. *Susan B. Anthony List*, 134 S.Ct. at 2342.

On those occasions when he did travel in the City of Shawnee without transporting a firearm in violation of the ordinance, Eric's only burden was his compliance with the ordinance. "[P]laintiffs can't satisfy the credible-threat-of-prosecution test by relying on evidence of their compliance with the challenged statute." *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 548 (10th Cir. 2016) (citing *Susan B. Anthony List*, 134 S.Ct. at 2342). Eric does not point to any cognizable injury or costs associated with having traveled on these occasions in compliance with the ordinance.

As for the two times when he did travel with a firearm in violation of the ordinance, Eric has not come forward with specific facts

showing a genuine issue for trial that he faced a credible threat of this ordinance being enforced against him. The facts are uncontroverted that Eric was never stopped, threatened with arrest, arrested, charged or prosecuted under the ordinance. There is nothing about the circumstances of Eric's occasional travels in the City that makes enforcement of this ordinance against him a credible imminent threat. Eric's alleged injuries are merely conjectural and hypothetical and will not satisfy the injury-in-fact requirement. *See Clapper v. Amnesty Intern. USA*, ---U.S.---, 133 S.Ct. 1138, 1147 (2013) ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." (internal quotation marks and citation omitted); *Hickenlooper*, 823 F.3d at 554 ("'persons having no fears of state prosecution except those that are imaginary or speculative, are not be accepted as appropriate plaintiffs'") (quoting *Babbitt*, 442 U.S. at 298). The plaintiff Eric's alleged fear and anxiety here over the ordinance's possible enforcement against him when he visited the City are too speculative to satisfy the injury-in-fact prong of the standing requirement. There is nothing about Eric's travels in the City or about his communications with the City that would suggest he ever received a warning or threat or ever faced a credible threat of arrest or prosecution. This is not a First Amendment case in which standing may arise from forced self-censorship. For that matter,

Eric cannot meet the high hurdles for bringing a facial challenge. *See Dias v. City and County of Denver*, 567 F.3d at 1179-80. This is not a case that warrants relaxing the standing requirements in order to facilitate a constitutional challenge that would not otherwise be made. The plaintiff Jonathan remains in the case and has standing as he was arrested, charged and prosecuted under the challenged ordinance.  In sum, the court finds that as a matter of law the plaintiff Eric cannot satisfy the injury-in-fact requirement for standing on His Second Amendment claim for compensatory damages.  On this issue, the plaintiffs' motions for summary judgment are denied, and the defendant's motion is granted.

**COUNTS 2-4**

These three counts turn on the constitutionality of the City's firearm Ordinance. Count two claims Jonathan's Second Amendment rights were violated by the Ordinance. Count three claims the City's enforcement of the unconstitutional Ordinance resulted in a prolonged detention that violated Jonathan's Fourth Amendment right. Similarly, count four claims the City's enforcement of the unconstitutional Ordinance resulted in an unreasonable search that violated Jonathan's Fourth Amendment right. All of these claims turn on the constitutionality of the City's Ordinance. Jonathan alleges the Ordinance is unconstitutional and either directly violates his right under the Second Amendment or eviscerates the City's justification for detaining and searching him in violation of his Fourth Amendment rights.

14

PRE-EMPTION

Jonathan first contends that his Fourth Amendment rights were violated in that the Ordinance was unenforceable, that is, null and void, because state law had pre-empted it prior to December 2, 2013. Jonathan has no viable authority for his argument. The governing Kansas statute in 2013, K.S.A. § 12-16,124, prohibited a city or county from adopting an ordinance governing the transfer of firearms except that a city or county was not prohibited:

> from adopting an ordinance, resolution or regulation requiring a firearm transported in any air, land or water vehicle to be unloaded and encased in a container which completely encloses the firearm or any less restrictive provision governing the transporting of firearms, provided such ordinance, resolution or regulation shall not apply to persons licensed or recognized under the personal and family protection act.

K.S.A. 12-16,124 (2013). If a state statute contains express exceptions, a city may also regulate within the subject area as long as the city's ordinance does not conflict with the state law. *Johnson County Water Dist. No. 1 v. City Council of Kansas City*, 255 Kan. 183, 194, 871 P.2d 1256 (1994). The City's Ordinance in question here matches the express exception allowed in state law by making it a crime to "transport[. . .] a firearm in any air , land, or water vehicle, unless the Firearm is unloaded and encased in a container which completely encloses the firearm." City of Shawnee, Ordinance No. 3003, § 9.13.040(A)(4), (Dk. 87-1, p. 10). Paragraph B exempts a person who is in possession of a current and valid license under the Kansas Personal

and Family Protection Act. *Id.* The court finds no conflict between the Ordinance and the state law, because it does not authorize something that the statute forbids and it does not forbid something that the statute authorizes. The plaintiff's cursory reading of the Kansas Attorney General Opinions does not support any finding of a conflict. In fact, the cited Opinion No. 2011-024 submitted by the plaintiff actually supports the conclusion of no preemption. (Dk. 118-1, pp. 63-64). The defendant is entitled to summary judgment on this claim.

*Equal Protection and Due Process*

The plaintiff here is arguing the Ordinance impacts a fundamental right to self-defense, namely, his "'immediate' access to 'loaded' firearms." (Dk. 87, p. 39). The plaintiff's premise is that his constitutional right to self-defense includes having immediate access to an uncased and loaded firearm while traveling in a vehicle. The court will address this part of the plaintiff's argument in its later discussion of the Second Amendment and, in particular, the Supreme Court's statements in *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." For now, the court briefly addresses the plaintiff's unusual arguments that the Ordinance violates the equal protection clause in exempting persons who have an optional license and violates the due

16

process clause in requiring licenses from those who already have experience and training with firearms.

The Ordinance at issue creates the offense of "Criminal Possession of a Firearm" as defined in five separate paragraphs. (Dk. 87-1, pp. 9-10). As relevant here, paragraph four lists as an offense the "[t]ransporting a Firearm in any air, land, or water vehicle, unless the Firearm is unloaded and encased in a container which completely encloses the Firearm." *Id.* For the offenses in paragraphs four and five, the Ordinance recognizes nine separate paragraphs of exemptions for law enforcement officers, for people on their land or in their dwelling, for various public and private officers engaged in public safety activities, and for "[p]ersons . . .in possession of a current and valid License" as defined by the Kansas Personal and Family Protection Act ("KPFPA"). *Id.*

The plaintiff argues the KPFPA license exemption to the Ordinance results in an unconstitutional differentiation involving two discrete sets:  first, non-resident travelers who are denied the opportunity for a KPFPA license, and second, Kansas residents who are trained and experienced in handling firearms but who choose not to have a KPFPA license.  Under the heading of due process, the plaintiff argues the Ordinance is in violation for requiring licenses from persons who already have experience with firearms. He curiously argues that a license applicant

would be forced to commit perjury if he complied with the requirement of

saying that he "desired" a license when he actually did not "desire" a license.

   The distinction between these claims is important:

> The Equal Protection and Due Process clauses protect distinctly
> different interests. On the one hand, the "substantive component" of
> the Due Process Clause "provides heightened protection against
> government interference with certain fundamental rights and liberty
> interests," *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct.
> 2258, 138 L.Ed.2d 772 (1997), even when the challenged regulation
> affects all persons equally. In contrast, "the essence of the equal
> protection requirement is that the state treat all those similarly
> situated similarly," *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149
> (10th Cir.2001) (quotations omitted), with its "central purpose [being]
> the prevention of official conduct discriminating on the basis of race
> [or other suspect classifications,]" *Washington v. Davis*, 426 U.S. 229,
> 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). As such, equal protection
> only applies when the state treats two groups, or individuals,
> differently.

*Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004), *cert. denied*, 544

U.S. 920 (2005). First, as he is a resident of Kansas, the plaintiff has not

alleged standing to bring an equal protection claim alleging the rights of

non-residents. If this is intended to be a facial challenge, then the court's

later ruling against all facial challenges also will apply here. Second, the

plaintiff has not come forward with a viable equal protection claim based on

the licensing exemption. The plaintiff does not show that the licensing

exemption treats similarly situated people differently. The plaintiff does not

assert that he was precluded from obtaining a KPFPA license. The plaintiff

purports to argue that people who have training and experience with

firearms are similarly situated to those who have KPFPA licenses. The

plaintiff explains, "the minimal training and experience required by the KPFPA conceal carry License application process pales in comparison to many who have been in the military, hunted all their life, etc." (Dk. 87, p. 44). The plaintiff proposes a less restrictive policy which would allow for persons having alternative training or experience to prove the same with documentation and receive a similar exemption.

"The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Soskin v. Reinertson*, 353 F.3d 1242, 1247 (10th Cir. 2004) (internal quotation marks and citation omitted). The plaintiff cannot show that persons having training and experience with firearms are in all relevant respects similarly situated to those who have KPFPA licenses. Besides the completion of a safety and training course, the licensing requirements also addressed qualifications related to residency, federal or state prohibitions on firearm handling, age, criminal history, and mental health findings. K.S.A. 75-7c04, 75-7c05. The license application also required "a statement that the applicant desires a concealed handgun license as a means of lawful self-defense." K.S.A. 75-7c05(a)(5) (2011). By being licensed, a person becomes part of a state database. K.S.A. 75-7c06(d). All of these circumstances certainly establish that a person with firearm training and experience is **not** for all relevant purposes similarly situated to a person having a KPFPA license. Indeed, the license exemption matches up with the Supreme Court's

holding in *Heller* that it was not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626. It also matches up with the remedy in *Heller,* "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." 554 U.S. at 635. In short, the plaintiff has not alleged and shown discriminatory treatment of persons similarly situated by the Ordinance's exemption for persons having a KPFPA license.

For his due process claim, the plaintiff's arguments are equally lacking in merit. He complains about the Second Amendment right being burdened by having to go through the licensing process and disclosing personal information particularly when a person already has firearm training and experience. As discussed earlier, the court finds that the Ordinance's exemption for licensed persons has a broader purpose than insuring experience with firearms. *See Peterson v. LaCabe*, 783 F. Supp. 2d 1167, 1174-75 (D. Colo. 2011) ("Colorado has a substantial interest in restricting permits to those persons whose information [from background checks and ongoing monitoring that is relevant to a disqualifying factor] is more readily available; moreover, the restriction is tailored to that need."), *aff'd on other grounds*, 707 F.3d 1197 (10th Cir. 2013). Consistent with *Heller*, these other purposes are undeniably valid and constitutional reasons for licensing and justify the licensing process and disclosures required under it. Moreover, the

court construes the plaintiff's argument as no more than an indirect and
duplicative Second Amendment challenge. The court rejects this claim an
effort to raise a duplicative claim under substantive due process grounds.
*See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (quoting
*United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)("[I]f a constitutional
claim is covered by a specific constitutional provision, such as the Fourth or
Eighth Amendment, the claim must be analyzed under the standard
appropriate to that specific provision, not under the rubric of substantive due
process."). The court finds no valid arguments here for a due process claim.

*Facial Challenge*

The plaintiff next makes a facial challenge to the statute and
opines that, "[t]here is no significant difference between a facial challenge
and an as-applied challenge except for the number of people (or sets of
people) considered in the challenge and the potential outcome." (Dk. 87, p.
46). The plaintiff then challenges the Ordinance as unconstitutional in
restricting the Second Amendment rights of those non-exempt persons "who
are members of the people's militia and engaged in militia duties or
activities" or who are law-abiding residents transporting a loaded firearm
"for the purpose of immediate self defense." (Dk. 87, pp. 47-48). The
plaintiff contrasts the Ordinance with Florida law which imposes licensing
requirements but exempts law enforcement which are defined as to include
state militia. Without this exemption, the plaintiff insists the Ordinance is

unconstitutional and null and void. As for law-abiding residents, the plaintiff argues the Ordinance keeps them from having the immediate defense of a loaded firearm while at home because "it is physically impossible to unload and encase a firearm the very instant one moves from one's home and onto the public road." (Dk. 87, p. 54). None of these arguments makes out a viable facial challenge to the Ordinance.

"Facial challenges are strong medicine." *Ward v. Utah*, 398 F.3d 1239, 1246 (10th Cir. 2005). Consequently, they "'are disfavored,' . . . , and generally fail if any 'set of circumstances exists under which the [law] would be valid.'" *Peterson v. LaCabe*, 783 F. Supp. 3d at 1173 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-450 (2008)). "Facial overbreadth challenges are disfavored and permitted 'in relatively few settings, and, generally, on the strength of specific reasons weighty enough to overcome [courts'] well-founded reticence.' *United States v. Decastro,* 682 F.3d 160, 169 (2d Cir. 2012) *(*quoting *Sabri v. United States,* 541 U.S. 600, 609–10 (2004)), *cert. denied*, 133 S. Ct. 838 (2013).

The plaintiff's facial challenges fail to meet the above thresholds. He has not shown that the Ordinance lacks any "plainly legitimate sweep" in prohibiting the transportation of loaded or non-encased firearms subject to the stated exemptions. *Hightower v. City of Boston*, 693 F.3d 61, 77-78 (1st Cir. 2012). The plaintiff does not even attempt to show the Ordinance to be lacking any lawful application. Instead, the plaintiff wants to show the

statute is overbroad in not exempting militia and in implicating home

possession. As judged by related city ordinances setting forth the definition

of a law enforcement officer, § 9.13.004 (Dk. 87-1, p. 5)("any person who

by virtue of office . . . is vested by law with a duty to maintain public

order"), and by the exemption for "persons found on their land, in their

dwelling, or fixed place of business," § 9.13.040(B)(2), the plaintiff has not

necessarily shown the Ordinance to be overbroad. Even if he had, the court

would follow the Fourth Circuit's approach and reject a facial challenge here:

> Without entertaining the novel notion that an overbreath challenge
> could be recognized "outside the limited context of the First
> Amendment," *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095, we conclude
> that a person, such as Masciandaro, to whom a statute was
> constitutionally applied, "will not be heard to challenge that statute on
> the ground that it may conceivably be applied unconstitutionally to
> others, in other situations not before the Court." *Broadrick v.
> Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).
> This conclusion "reflect[s] the conviction that under our constitutional
> system courts are not roving commissions assigned to pass judgment
> on the validity of the Nation's laws." *Id.* at 610–11, 93 S.Ct. 2908; *see
> also Gonzales v. Carhart*, 550 U.S. 124, 167–68, 127 S.Ct. 1610, 167
> L.Ed.2d 480 (2007) ("It is neither our obligation nor within our
> traditional institutional role to resolve questions of constitutionality
> with respect to each potential situation that might develop…. For this
> reason, '[a]s-applied challenges are the basic building blocks of
> constitutional adjudication' " (quoting Richard H. Fallon, Jr., *As–
> Applied and Facial Challenges and Third–Party Standing*, 113 Harv. L.
> Rev. 1321, 1328 (2000))); *Skoien*, 614 F.3d at 645 ("[a] person to
> whom a statute properly applies [cannot] obtain relief based on
> arguments that a differently situated person might present").
> Accordingly, we reject his facial challenge.

*United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir.), *cert. denied*,

132 S. Ct. 756 (2011); *United States v. Chester*, 514 Fed. Appx. 393, 395,

2013 WL 1189253, p. *2 (4th Cir. Mar. 25, 2013)("[N]o circuit has accepted

an overbreadth challenge in the Second Amendment context."). As shown later, the court will conclude that the Ordinance had been applied properly and constitutionally to the plaintiff. Thus, the court rejects the plaintiff's facial challenges as argued in all aspects.

*Second Amendment*

In its prior order, the court has summarized the relevant law governing the plaintiff's claims of unconstitutionality under the Second Amendment. The parties' briefing on this issue has not shown any error in the court's summary of law and its approach. For ease of reference, the court will quote extensively from its prior order:

> In *District of Columbia v. Heller,* 554 U.S. 570 (2008), the Supreme Court recognized an individual Second Amendment right to keep and bear arms and central to it, "the inherent right of self-defense," and concluded this right was violated by a statute that effectively banned all handgun possession in the home and required any lawful firearm to be rendered inoperable by disassembly or trigger lock:
>
>> The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," . . ., would fail constitutional muster.
>
> 554 U.S. at 628 (citation omitted). In addressing the statute that required weapons to be rendered inoperable, the Court added, "This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." 554 U.S. at 630. The Court did not address the licensing requirement and ordered, "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his

handgun and must issue him a license to carry it in the home." 554 U.S. at 635. In *McDonald v. City of Chicago, Ill.*, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the Court found the Fourteenth Amendment made the Second Amendment right to keep and bear arms fully applicable to the States and struck down two Illinois cities' ordinances that effectively banned handgun possession by almost all private citizens. One of the cities had ordinances that required valid registration certificates for any firearm possessed and that "prohibit[ed] registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City." 177 L.Ed.2d at 904.

The Tenth Circuit has agreed with other circuits that *Heller* follows a "two-pronged approach to Second Amendment challenges" that entails:

> *Heller* thus "suggests a two-pronged approach to Second Amendment challenges" to federal statutes. *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *see United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc). Under this approach, a reviewing court first "ask[s] whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Marzzarella*, 614 F.3d at 89. "If it does not, [the court's] inquiry is complete." *Id*. "If it does, [the court] must evaluate the law under some form of means-end scrutiny." *Id*. "If the law passes muster under that standard, it is constitutional." *Id*. "If it fails, it is invalid." *Id*.

*United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010). In *Reese*, the circuit panel concluded the federal law prohibiting possession of a firearm while subject to a domestic protection order imposed a burden on the challenger's right to possess otherwise legal firearms.

The answer to the first step demands "an 'historical inquiry' into 'whether the conduct at issue was understood to be within the scope of the right at the time of ratification.'" *Kolbe v. Hogan*, 813 F.3d 160, 172 (4th Cir. 2016) (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) and citing *Heller*, 554 U.S. at 626-27), *rehearing en banc granted*, 2016 WL 8511670 (Mar. 4, 2016). Thus, "'if the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.'" *Id*. The Court in *Heller* affirmatively establishes the "guarantee," pre-existing the Second Amendment, of "the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. The purpose for this right was not just to preserve the militia

but extended to "self-defense and hunting." 554 U.S. at 599. While *Heller* discussed the purpose of self-defense within the home, *the* Tenth Circuit recently acknowledged that, "[t]he need for self-defense, albeit less acute, certainly exists outside the home as well. *Moore v. Madigan*, 702 F.3d 933, 935–40 (7th Cir. 2012), *rehearing en banc denied*, 708 F.3d 901 (7th Cir. 2013).

"The right to keep and bear arms as a matter of history and tradition, 'is not unlimited,' of course, as even law-abiding citizens do not have 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Kolbe*, 813 F.3d at 172 (quoting *Heller*, 554 U.S. at 626). "Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Ezell v. City of Chicago*, 651 F.3d 684, 702-703 (7th Cir. 2011). Common sense is apparent in the Seventh Circuit's latest comment on this topic:

> *Heller* does not purport to define the full scope of the Second Amendment. The Court has not told us what other entitlements the Second Amendment creates or what kinds of gun regulations legislatures may enact. Instead the Court has alerted other judges, in *Heller* and again in *McDonald*, that the Second Amendment "does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020 (plurality opinion); *Heller*, 554 U.S. at 626–27 & n. 26, 128 S.Ct. 2783. Cautionary language about what has been left open should not be read as if it were part of the Constitution or answered all possible questions. It is enough to say, as we did in [*United States v.*] *Skoien*, 614 F.3d [638] at 641 [(7th Cir. 2010)(en banc)], that at least some categorical limits on the kinds of weapons that can be possessed are proper, and that they need not mirror restrictions that were on the books in 1791.

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 410 (7th Cir. 2015) *cert. denied sub nom.*, *Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447 (2015).

The plaintiffs frame the right protected by the Second Amendment and implicated by the ordinance as the general public's right to transport in a vehicle a firearm that is either loaded or not encased. Reading § 9.13.040 in its full context suggests a different framing of this right. This ordinance actually exempted from the transportation restriction any person who was "in possession of a

current and valid License" under "the Kansas Personal and Family Protection Act, pursuant to K.S.A. 75-7c01 and K.S.A. 75-7c17, to encompass the entire act and all exemptions included therein." (Dk. 13-1, p. 7). This statutory license would permit carrying a concealed handgun and would be issued only after meeting various requirements including, most notably, the completion of a safety and training course and a criminal background check. This exemption of those licensed for conceal carry would certainly change the right implicated here, in that a person so licensed was not prohibited from transporting in a vehicle a firearm that was loaded and that was not encased. *See, e.g.*, *Horsley v. Trame*, 61 F. Supp. 3d 788, 791-93 (S.D. Ill. 2014), *aff'd*, 808 F.3d 1126 (7th Cir. 2015). Neither side has incorporated this exemption into their Second Amendment analysis offered in this summary judgment proceeding.

For purposes of this motion, the court is going to follow the approach of some circuits and simply assume Second Amendment application and move to the second step. The defendant took this position in its brief. The court believes this makes sense here, as the parties have not separately analyzed the first step and as the right implicated by this repealed ordinance has not been fully defined by the parties and, therefore, is subject to some deliberation. *See United States v. Hosford*, 82 F. Supp. 3d 660, 664-65 (D. Md. 2015). With that said, the court recognizes that since *Heller* and *McDonald*, the Tenth Circuit has observed the "narrowness" of the holding in *Heller* and the Court's recognition:

> "Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial side of arms."

*Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1124 (10th Cir. 2015) (quoting *Heller*, 554 U.S. at 626-27), *cert. denied*, 2016 WL 1078949 (Mar. 21. 2016). The Tenth Circuit also quoted the footnote attached to this statement in *Heller*, "'We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.'" *Id*. at n.1 (quoting *Heller*, 554 U.S. at 627 n. 26). These same assurances were repeated by the Court in *McDonald*. *Bonidy*, 790 F.3d at 1124-25. Thus, the court in *Bonidy* concluded, "the Second Amendment right to carry firearms does not apply to federal buildings and adjacent parking lots. 790 F.3d at 1125.

Assuming the right implicated by the full text of the ordinance does come within the Second Amendment, the court will

evaluate the ordinance using a means-end scrutiny. The Tenth Circuit recently stated, "If Second Amendment rights apply outside the home, we believe they would be measured by the traditional test of intermediate scrutiny. *See United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to a Second Amendment as-applied challenged to § 922(g)(8))." *Bonidy*, 790 F.3d at 1126. The *Bonidy* panel expressed a rationale for this test that is on all fours with the circumstances here:

> Intermediate scrutiny makes sense in the Second Amendment context. The right to carry weapons in public for self-defense poses inherent risks to others. Firearms may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate. The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others. Intermediate scrutiny appropriately places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety.

790 F.3d at 1126. The Tenth Circuit precedent compels this court to apply the traditional test of intermediate scrutiny. Thus, "[t]o pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *United States v. Reese*, 627 F.3d at 802 (internal quotation marks and citation omitted).

The court is not convinced from reading the parties' briefs that the defendant will not be able to carry its burden at this step as a matter of law. Indeed, the defendant argues several possible public safety aims that are important, that seem to be aims of the ordinance, and that seem to be advanced by substantially related means. Pointing uncased firearms and/or using loaded firearms during the operation of vehicles on public roadways plainly carry safety risks that go beyond those commonly associated with the firearm itself. Additionally, the defendant describes such conduct as associated with "road rage" incidents so that prohibiting this conduct could prevent escalation into these incidents and all the safety risks involved with them. The defendant borrows some of the reasoning from *United States v. Masciandaro*, 638 F.3d at 473-74, which found no Second Amendment violation in the application of a federal regulation that prohibited

carrying or possessing a loaded handgun in a motor vehicle within a national park:

> Loaded firearms are surely more dangerous than unloaded firearms, as they could fire accidentally or be fired before a potential victim has the opportunity to flee. The Secretary could have reasonably concluded that, when concealed within a motor vehicle, a loaded weapon becomes even more dangerous. In this respect, § 2.4(b) is analogous to the litany of state concealed carry prohibitions specifically identified as valid in *Heller*. *See* 128 S. Ct. at 2816–17. By permitting park patrons to carry unloaded firearms within their vehicles, § 2.4(b) leaves largely intact the right to "possess and carry weapons in case of confrontation." *Heller*, 128 S.Ct. at 2797. While it is true that the need to load a firearm impinges on the need for armed self-defense, see Volokh, *Implementing the Right for Self–Defense*, 56 U.C.L.A. L. Rev. at 1518–19, intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question. *See United States v. Baker*, 45 F.3d 837, 847 (4th Cir. 1995). Moreover, because the United States Park Police patrol Daingerfield Island, the Secretary could conclude that the need for armed self-defense is less acute there than in the context of one's home.

638 F.3d at 473-74. The defendant highlights the increased danger of transporting loaded firearms and the reduced need for self-defense as the public roadways are patrolled by law enforcement officers. The defendant also notes that the ordinance does not utterly foreclose armed self-defense, nor must the ordinance be the least intrusive means of attaining the governmental objective. The ordinance permits the possession of an unloaded and encased weapon, and nothing prevents a person from pulling over a vehicle and then uncasing and loading a vehicle for self-defense use outside of the vehicle. This would serve the public safety purpose of preventing the exchange of gunfire between vehicles operating on public roadways and all of the safety risks associated with these incidents. Thus, the defendant asks the court to find that the ordinance survives intermediate scrutiny and that it does not violate the plaintiff's Second Amendment rights.

       Because the constitutional issue had not been properly framed for the court's final ruling at this time, because the parties have not been afforded a full opportunity to brief all of the matters related to this issue, some of which are noted above, and because the

parties now have a legal template for advancing their arguments, the court will withhold its ruling at this time.

(Dk. 26, pp. 10-19).

On the first prong, the defendant contends the Ordinance does not burden conduct falling within the Second Amendment, because "[n]either the Supreme Court nor the Tenth Circuit has ever acknowledged that Second Amendment rights exist outside of the home." (Dk. 109, p. 11). The defendant contrasts the Ordinance with the restrictive laws essentially banning handguns in the home that were struck down in *Heller*. The Ordinance is "hardly a serious burden" in that it allows someone to transport an unloaded firearm in an unlocked case with ammunition stored right next to the gun. (Dk. 109, p. 13). Even assuming this to be a constitutional burden, Ordinance gives one the option of obtaining a KPFPA conceal carry license so as to be exempt from the burden. Finally, the defendant proposes recognizing a correspondence between the transportation of firearms in a vehicle and the carrying of a concealed firearm. The defendant points to *Heller's* observation that state law prohibitions against the carrying of concealed weapons have withstood Second Amendment challenges and also points to the Tenth Circuit holding that rejects a Second Amendment right to carry a concealed weapon.

The Tenth Circuit in *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013), in construing and applying *Heller*, concluded on the first prong that the Second Amendment did not provide the right to carry a concealed

weapon. *Id.* at 1209. The Tenth Circuit explained its conclusion in these

terms:

> [T]he *Heller* opinion notes that, "[l]ike most rights, the right secured
> by the Second Amendment is not unlimited. From Blackstone through
> the 19th-century cases, commentators and courts routinely explained
> that the right was not a right to keep and carry any weapon
> whatsoever in any manner whatsoever and for whatever purpose." 554
> U.S. at 626, 128 S.Ct. 2783. As an example of the limited nature of
> the Second Amendment right to keep and carry arms, the Court
> observed that "the majority of the 19th-century courts to consider the
> question held that prohibitions on carrying concealed weapons were
> lawful under the Second Amendment or state analogues." *Id.* And the
> Court stressed that "nothing in our opinion should be taken to cast
> doubt on longstanding prohibitions." *Id.*
>
> There can be little doubt that bans on the concealed carrying of
> firearms are longstanding. In *Heller*, the Supreme Court cited several
> early cases in support of the statement that most nineteenth century
> courts approved of such prohibitions. . . .
>
> . . . Given this lengthy history of regulation, restrictions on
> concealed carry qualify as "longstanding" and thus "presumptively
> lawful regulatory measures." *Heller*, 554 U.S. at 626 & n. 26, 128
> S.Ct. 2783; see also *National Rifle Association of America, Inc. v.
> Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196
> (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed
> 'longstanding' even if it cannot boast a precise founding-era
> analogue.... Heller considered firearm possession bans on felons and
> the mentally ill to be longstanding, yet the current versions of these
> bans are of mid–20th century vintage." (citations omitted)).
>
> . . . Given the dicta in *Robertson*, 165 U.S. at 281–82, 17 S.Ct.
> 326, and the Supreme Court's admonition in *Heller* that "nothing in our
> opinion should be taken to cast doubt on longstanding prohibitions,"
> 554 U.S. at 626, 128 S.Ct. 2783, we conclude that Peterson's Second
> Amendment claim fails at step one of our two-step analysis: the
> Second Amendment does not confer a right to carry concealed
> weapons.

*Peterson v. Martinez*, 707 F.3d at 1210-11. The Tenth Circuit later in *Bonidy*

held "that the Second Amendment right to carry firearms does not apply to

federal buildings, such as post offices," or to the parking lot that exclusively

served the federal building and is therefore "part of" the federal building. 790 F.3d at 1125-26. As the First Circuit has observed, the Supreme Court in *Heller* and *McDonald*, "did not say, and to date has not said, that *publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment." *Powell v. Tompkins*, 783 F.3d 332, 348 (1st Cir. 2015) ("Debate continues among courts." citations omitted), *cert. denied*, 136 S. Ct. 1448 (2016). Recently, a federal district court summarized the state of this debate with two circuits, the Seventh and Ninth, "hav[ing] expressly recognized a Second Amendment right to bear arms for self-defense that extends beyond the home" while the remaining circuits are content with assuming without deciding that this right exists. *Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 622 (E.D. Mich. 2016).[2] As far as this debate, the Tenth Circuit has taken its position of assuming without deciding both in *Peterson* when it rejected the more specific Second Amendment right to carry outside of the home a concealed weapon and in *Bonidy* when it rejected the right to carry a firearm in federal buildings.

At the same time, the court recognizes the need for self-defense extends beyond the home and implicates the right to bear arms for that purpose. The Tenth Circuit recognizes this point, as well, in *Bonidy*:

---

[2] Since *Chesney*, the Ninth Circuit sitting *en banc* changed its position to the "Second Amendment may or may not protect, to some degree, a right of a member of the general public to carry firearms in public." *Peruta v. County of San Diego*, 824 F.3d 919, 927 (9th Cir. 2016).

> This alternative holding assumes that the right to bear arms recognized in *Heller* in the home would also apply, although with less force, outside the home. This seems like a reasonable assumption because the Second Amendment right is "to keep and bear" arms, and "bear" certainly implies the possibility and even the likelihood that the arms will be carried outside the home. Also, the Second Amendment right recognized by the Supreme Court is predicated on the right of self-defense. *Heller*, 554 U.S. at 595, 128 S.Ct. 2783. The need for self-defense, albeit less acute, certainly exists outside the home as well. *Moore v. Madigan*, 702 F.3d 933, 935–40 (7th Cir.2012)

*Bonidy v. U.S. Postal Serv.*, 790 F.3d at 1125 (footnote omitted). There is nothing in the case law to date that would justify departing from Tenth Circuit precedent. Thus, the court will assume the Second Amendment protects to some degree a right to bear arms in public.

This brings us to the more specific argument on applying the Tenth Circuit's holding in *Peterson* that there is no Second Amendment right for members of the public to carry concealed weapons in public. 707 F.3d at 1211; *see Peruta v. County of San Diego*, 824 F.3d 919, 927 (9th Cir. 2016). "If the government establishes that the challenged law regulates activity outside the scope of the Second Amendment as understood at the time of the framing of the Bill of Rights, the activity is unprotected and the law is not subject to further constitutional scrutiny." *Tyler v. Hillsdale County Sheriff's Dept.*, 837 F.3d 678, 685-86 (6th Cir. 2016). There is no question that the Ordinance here addresses the public carry of firearms, as with *Peterson*. In that context, the distinction recognized is "between open carry of a handgun—such as in a visibly exposed belt holster—and concealed carry—such as hidden from view under clothing or in a pocket." *Drake v.*

*Filko*, 724 F.3d 426, 440 (3rd Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2014).

The Ordinance does not refer to the transportation offense as a concealed carry regulation, but it does recognize that someone with a conceal carry license is exempt from this offense. Nor does the Ordinance incorporate an element or make a distinction based on whether the transported firearm is visible or not to someone outside of the vehicle. Nonetheless, there is no serious question that firearms being transported in a vehicle are most typically not visible to others outside of the vehicle. *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) ("*Heller*'s approval of concealed weapons bans provides further support for rejecting Masciandaro's as-applied challenge, as carrying a loaded weapon in a motor vehicle—an act which, by definition, is almost always outside the view of those nearby—presents the sort of compelling safety risk more adequately resolved by legislation than judicial *ipse dixit*."), *aff'd*, 638 F.3d 45 (4th Cir.), *cert. denied*, 132 S. Ct. 756 (2011). The court agrees that firearms transported in vehicles will "almost always" not be open but hidden from the view of others outside of the vehicle.

Thus, the Ordinance fairly represents the defendant's effort to regulate activity similar to or in kind with the concealed carry of firearms. This conclusion is supported by the Ordinance's very operation. It groups transporting a firearm in a vehicle and carrying a firearm concealed on one's

body in applying the exemptions listed in subsection B. There is nothing unusual about this legislative grouping and treating together the activities of firearms being transported in vehicles and firearms being carried concealed on one's body. *See, e.g.*, *United States v. Bridges*, 2016 WL 3922354, at *6 (E.D. Mich. Jul. 21, 2016); *Banks v. Gallagher*, 2010 WL 5862994 at *10 (M.D. Pa. Dec. 13, 2010), *adopted in part and rejected in part*, 2011 WL 718632 (M.D. Pa. Feb. 22, 2011). The Fourth Circuit described a federal regulation prohibiting the possession of loaded weapons in a motor vehicle on national park areas as "analogous to the litany of state concealed carry prohibitions specifically identified as valid in *Heller*." *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011).

On the other hand, the court realizes the apparent policy interests behind the Ordinance do not squarely match up with those historically expressed for regulating concealed carry, *Peterson*, 707 F.3d at 1210-11. Yet, the court is satisfied in that they share a common concern for preserving the right to self-defense without creating untoward and unseemly circumstances that go beyond self-defense. As stated in *Peterson*, the right "is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations." 707 F.3d at 1210 (quoting *State v. Chandler*, 5 La. Ann. 489, 490 (1850)). The Ordinance exempts someone with a KPFPA license which is obtained only after the applicant states that the concealed

handgun license is desired "as a means of lawful self-defense." K.S.A. 75-

7c05(a)(5) (2013). Thus, not unlike in *Peterson*, the Ordinance works to

preserve a person's need to have a firearm for self-defense through

licensing. And even if someone does not want a license, the Ordinance does

not prevent the self-defense use of a firearm, but only after the serious risk

from firearms fired from vehicles on public roads is reduced by stopping and

exiting the vehicle. The court finds the similarities between concealed carry

and vehicular transportation to be sufficient in terms of regulatory effect,

kind and purpose as to justify applying *Peterson* here. Thus, the court

concludes that the fair, logical and reasonable application of *Peterson* here

means that there is no Second Amendment right for members of the public

to transport loaded and non-encased firearms in their vehicles without a

concealed carry permit. In sum, the plaintiff has failed to make a strong

showing that his circumstances are sufficiently distinguishable "from those of

persons historically excluded from Second Amendment protections."

*Binderup v. Atty. Gen. U.S. of America*, 836 F.3d 336, 347 (3rd Cir. 2016).

Assuming the right implicated by the Ordinance comes within the

Second Amendment and jumping over this first prong, as appellate courts

have sometimes "deemed it prudent to" do, *Woollard v. Gallagher*, 712 F.3d

865, 875 (4th Cir.), *cert. denied*, 134 S. Ct. 422 (2013), the court would

evaluate the Ordinance using the traditional test of intermediate scrutiny

followed by Tenth Circuit precedent, *Bonidy*, 790 F.3d at 1126. The court

36

does not consider this level of means-end scrutiny to be an open question, as the Tenth Circuit's holding is clear and indistinguishable from this case and is consistent with its precedent, *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010), *cert. denied*, 563 U.S. 990 (2011), and with that of other circuits, *see, e.g., Tyler v. Hillsdale County Sheriff's Dept.*, 837 F.3d 678, 692-93 (6th Cir. 2016)("Many of our sister circuits have also held that intermediate scrutiny is applicable."); *Binderup v. Atty. Gen. U.S. of America*, 836 F.3d 336, 353 (3rd Cir. 2016); *Jackson v. City and County of San Francisco*, 746 F.3d 953, 963-65 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015); *Woollard v. Gallagher*, 712 F.3d 865, 875 (4th Cir. 2013); *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), *cert. denied*, 132 S. Ct. 1538 (2012). The Tenth Circuit found in *Bonidy* that this level of scrutiny "makes sense" because firearms create "inherent risks to others." 790 F.3d at 1126. This risk distinguishes the Second Amendment right from the other fundamental constitutional rights that receive strict scrutiny. *Id.* "Intermediate scrutiny appropriately places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." *Id.* Intermediate scrutiny is appropriate here, because it does not burden the core Second Amendment right of responsible, law-abiding citizens to self-defense within their homes, *see Tyler*, 837 F.3d at 691-92, and because the burden here, in light of the license exemption, is anything but substantial.

Despite some varying vocabulary between the circuits on intermediate scrutiny in Second Amendment cases, the Tenth Circuit generally follows other circuits, "'To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective.'" *United States v. Reese*, 627 F.3d at 802 (quoting *United States v. Williams*, 616 F.3d 685, 692 (7th Cir.), *cert. denied*, 562 U.S. 1092 (2010)); *United States v Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir.) ("Under this standard a law is sustained if the government shows that it is 'substantially related' to an 'important' official end."), *cert. denied*, 133 S. Ct. 289 (2012). In looking at the government's interest, the courts recognize the generalizations involved with law-making on "threat to public safety—but general laws deal in generalities." *Huitron-Guizar*, 678 F.3d at 1170. "The bottom line is that crime control and public safety are indisputably 'important' interests." *Id.* As far as the relationship between the objective and the means, "'[a]ll that is required is "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served."'" *Tyler*, 837 F.3d at 693 (quoting *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 594 (6th Cir. 2003)(quoting in turn *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)), *cert. denied*, 541 U.S. 990 (2004)). "To be sure, substantial relation does not require every

individual in the class to exemplify the important objective." *Bonidy*, 790 F.3d at 1134 (Tymkovich J., dissenting) (citing *Huitron v. Guizar*, 678 F.3d at 1169 (prohibition of firearms to illegal aliens passes intermediate scrutiny even if the illegal alien has been in the United States for decades). Put another way, "[i]ntermediate scrutiny does not require a perfect fit between a rule's objectives and the circumstances of each individual subject to the rule." *Bonidy*, 790 F.3d at 1127.

The defendant City observes that the Ordinance does not ban the transport of firearms in vehicles but regulates the transport for safety purposes. More specifically, the Ordinance may alleviate fears of law enforcement officers that vehicle occupants who have not been subjected to concealed carry permit background checks also do not have immediate access to loaded firearms. This would not only protect officers upon an initial traffic stop and but upon any escalation of danger during the stop. Handling loaded firearms in a moving vehicle on a public roadway presents an obvious safety risk not only to the occupants of the vehicle but also to the public traveling on the roadway. The safe and secure transport of firearms would deter those immediate and emotionally charged responses that mark dangerous, even fatal, road rage incidents.

The City of Shawnee is not alone in recognizing these important public interests. Indeed, the Legislature of the State of Kansas certainly affirmed these same apparent public interests by exempting this very

circumstance from its general prohibition on city and county regulation of firearms. *See* K.S.A. 12-16,125(b)(4). Safety for those riding in a vehicle, for others on the road and for law enforcement officers is without question a significant, substantial and important governmental interest. The animating interests here are important in ensuring firearms are safely transported, in protecting against loaded firearms being immediately accessible to vehicle occupants who have not received firearm training and have not been subjected to a criminal and mental background check as part of the KPFPA licensing process, and in reducing the risk of loaded firearms becoming a part of a traffic stop or a road rage incident.

The plaintiff Clark wants to focus on what specific intent was expressed by the City in enacting this Ordinance. The plaintiff also wants to debate whether those having criminal intent would abide with this Ordinance. Finally, the plaintiff wants empirical evidence from the City to support that this Ordinance will serve these stated objectives. Because this Ordinance expressly embodies an exemption created by the Kansas Legislature and because this Ordinance plainly addresses substantial and important governmental interests, the court deems this debate unnecessary. As for proof that the Ordinance employs means substantially related to the objectives being advanced, this is apparent from the face of the Ordinance, from the evidence presented in the defendant's brief, and from other cases.

The court finds the Ordinance is reasonably tailored and adapted to meet its objectives. The licensing exemption plainly serves the safety interests advanced by firearm training and background checks and also insures that those needing immediate access to loaded firearms for self-defense are able to secure it. The balance of the Ordinance imposes restrictions that are reasonable and have a scope in proportion to the interests served. Firearms, even if cased and unloaded, remain available for one's self-defense and may still be transported in a vehicle. The Ordinance restricts only the manner in which they may be transported. The Ordinance reasonably addresses the danger of carrying and firing loaded weapons from a vehicle on a public roadway. The Ordinance's resulting delay to immediate access to a loaded weapon is not unreasonable or disproportionate to achieving the important governmental interests.

The court also has considered the defendant's statistical evidence on officers killed and assaulted in the line of duty and during traffic stops. Finally, the court is persuaded by the Fourth Circuit's analysis in *Masciandaro* upholding a federal regulation that prohibited carrying or possessing a loaded weapon in a motor vehicle within the national park areas. The court found:

> We also conclude that § 2.4(b)'s narrow prohibition is reasonably adapted to that substantial governmental interest. Under § 2.4(b), national parks patrons are prohibited from possessing loaded firearms, and only then within their motor vehicles. 36 C.F.R. § 2.4(b) ("Carrying or possessing a loaded weapon in a motor vehicle, vessel, or other mode of transportation is prohibited"). We have no occasion

in this case to address a regulation of unloaded firearms. Loaded firearms are surely more dangerous than unloaded firearms, as they could fire accidentally or be fired before a potential victim has the opportunity to flee. The Secretary could have reasonably concluded that, when concealed within a motor vehicle, a loaded weapon becomes even more dangerous. In this respect, § 2.4(b) is analogous to the litany of state concealed carry prohibitions specifically *474 identified as valid in *Heller*. See 128 S.Ct. at 2816–17.

By permitting park patrons to carry unloaded firearms within their vehicles, § 2.4(b) leaves largely intact the right to "possess and carry weapons in case of confrontation." *Heller*, 128 S.Ct. at 2797. While it is true that the need to load a firearm impinges on the need for armed self-defense, see Volokh, *Implementing the Right for Self–Defense*, 56 U.C.L.A. L. Rev. at 1518–19, intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question. *See United States v. Baker*, 45 F.3d 837, 847 (4th Cir. 1995). Moreover, because the United States Park Police patrol Daingerfield Island, the Secretary could conclude that the need for armed self-defense is less acute there than in the context of one's home.

Accordingly, we hold that, on Masciandaro's as-applied challenge under the Second Amendment, § 2.4(b) satisfies the intermediate scrutiny standard.

*Masciandaro*, 638 F.3d at 473–74. The Fourth Circuit's means-end scrutiny fairly parallels and supports the court's evaluation of the Ordinance here. The court concludes that the Ordinance satisfies the intermediate scrutiny standard and prevails against Clark's as-applied challenge on this second prong too. Suffice it to say, this same analysis would necessarily satisfy the rational basis scrutiny as well. Finally, to reiterate an earlier point, the court also follows *Masciandaro* in rejecting Clark's facial overbreadth challenge to the Ordinance. *Id*. at 474.

IT IS THEREFORE ORDERED that the plaintiffs' motion for partial summary judgment (Dk. 86), the plaintiffs' second motion for partial

summary judgment (Dk. 128), the plaintiffs' motions for review (Dks. 124 and 134), and the City's motion to strike (Dk. 130) are denied;

IT IS FURTHER ORDERED that the City's motion for summary judgment (Dk. 108) is granted. The clerk of the court shall enter judgment for the defendant City.

Dated this 5th day of January, 2017, Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge